## ROMAN CAIN v. STATE.

No. A-5838.  Opinion Filed July 9, 1927.
(257 Pac. 1114.)

Anglin & Stevenson, J. L. Skinner, and Forrest M. Darrough, for plaintiff in error.

Geo. F. Short, Atty. Gen., and Leverett Edwards, Asst. Atty. Gen., for the State.

EDWARDS, J.  The plaintiff in error, hereinafter called defendant, was charged in the district court of Hughes county with the crime of murder, was convicted of manslaughter in the first degree, and his punishment fixed at four years in the state penitentiary.

Only one assignment of error is argued in the brief; that is, that the evidence is insufficient to sustain the judgment.

The record discloses a state of facts about as follows: Both the defendant and deceased are full-blood Creek Indians between the ages of 25 and 30 years.  On the date of the homicide, defendant, his brother, and one Mitchell Hill went to Holdenville in a car.  Near the depot they met deceased on horseback, and invited him to join them.  He put his horse in the livery stable, and did so.

Deceased had been drinking, and, after he joined the parties in the car, they went to the negro section of the town, got a bottle of whisky, and drank it as they drove towards Hill's home. They stopped at Hill's home, and defendant, his brother, and Hill got out, stayed for some time, and deceased remained in the car. Defendant and his brother and deceased then started to the home of defendant at Wetumka. On the road they got into a difficulty, and, while deceased was seated in the car, defendant struck him two blows on the head with a car jack, and crushed his skull. Defendant and his brother testified in substance that deceased was very drunk, and scuffled with defendant, who was driving the car; threatened to kill them, and seized the brother by the throat; that defendant struck him, forcing him to release his hold, and the brother then ran, and defendant jerked the jack out of deceased's hand, struck him over the head, which caused his death.

Defendant contends that the homicide occurred while resisting an attack made upon him by deceased; that he used no more force than was reasonably necessary to repel the attack. After the body, which was left at the roadside, was discovered, defendant was questioned by an officer, and he denied any knowledge of the killing. Later defendant told the officer he had lied about the killing, and was going to tell the truth, and said:

"* * * We were in the road down there, was passing down about 10 or 11 o'clock on the road, two miles east of Yeager, and he jumped off of the car on the running board, and looked like he was going to choke me, and I just got the jack and knocked him down and killed him."

Upon the trial in reference to the difficulty between defendant, his brother, and deceased, defendant testified:

"* * * Q. What position did Charley have the jack in when you first saw the jack? A. He had it in that fashion. Had it in this way (indicating) with jack in his hand (indicating). Q. You were on the ground? A. Yes,

sir. Q. Now, what happened? A. When I saw that, I got him by the wrist and one hand on the jack, and wrenched the jack out of his hand. Q. Now, what did Charley say at that time, if anything? A. When I got the jack away from him, he grabbed me by the throat with his hand that way when I struck him. * * * Q. What did he say, if anything? A. He told me he was going to kill me. Q. Was Tom there then? A. He had ran off. Q. How big a man was Charley Kernall? A. He was a well-built man, kind of stocky man. Q. How big was he? Big as you are, or bigger? A. I think he was larger than I, just a trifle, though. Q. Why did you hit him with that jack? A. I hit him on the head. Q. Why? Why did you hit him with that jack? A. He had me by the throat, and that was the only way I had to get away, get loose. * * * Q. You wasn't afraid until after you got out of the car and come around back to him, were you? A. I was afraid of him, but then I left the key in the automobile, key sticking in the car, and I was afraid if I left the car with him he might take possession of it and get away with it, and I had to get out and come around. Q. Well, you came right around, and you saw the jack before you went up to him, didn't you? A. Yes, sir. Q. You went right up to him, with him the jack in his hand? A. When I came up I saw that he had the jack in his hand, and I grabbed. By the Court: Was he sitting down in the car? By Mr. Fancher: Q. Where was Charley Kernall? Was he in the car or out? A. He was in the car. Q. Was he sitting down or standing up? A. How? Who? Q. Now, Charley Kernall? A. He was sitting in the seat. Q. Was he sitting in the seat when you hit him? A. Yes, sir. Q. When you hit him— how did you hold this in your hand when you hit him? Show the jury how you held it when you hit him? A. Had it by the top. Q. How many times did you hit him? A. I think about twice. Q. And who opened the door and took him out? A. I don't know as to that, because I was scared, and I don't know just exactly—somewhere—Q. Who took him out of the car? A. I guess I took him out myself, because there was no one there, must took him out. Q. Well, was he dead or alive when you took him out? A. I don't know what shape he was in, I don't know whether he was dead or alive. Q. Well, he was absoutely helpless, wasn't he? A. He may have been able to help himself, but then he didn't say anything to me. Q. Well,

how did he get him out of the car? A. I got him out and laid him on the ground. * *, *"

Under the evidence it appears that defendant, his brother, and deceased engaged in a drunken row, deceased apparently being the more completely intoxicated of the three; that in such row he was struck by defendant on the head and killed. There were no eyewitnesses other than the participants. The circumstances and physical facts surrounding the killing and the testimony and statements of defendant and his brother make a case of manslaughter in the first degree, the minimum punishment for which was fixed by the jury.

The jury no doubt concluded that the testimony of defendant and his brother was as favorable as the facts would warrant. Where the evidence is such that the jury may reasonably and logically arrive at the guilt of a defendant, although it may be conflicting, or different inferences might be drawn, this court will not substitute its judgment for that of the jury, but will affirm the case.

The case is affirmed.

DOYLE, P. J., concurring.

DAVENPORT, J., absent, not participating.