## CLAUDE JONES v. STATE.

No. A-7412. Opinion Filed Aug. 29, 1930.
Rehearing Denied Sept. 20, 1930.
(290 Pac. 927.)

U. G. Winn, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was tried for the crime of murder, and convicted of manslaughter in the first degree, and sentenced to be confined in the state penitentiary for a period of four years.   Motion for new trial was filed, considered, overruled, exceptions saved, and the defendant has appealed to this court.

The record is voluminous.   The testimony on behalf of the state that is deemed necessary to set out is, in substance, as follows:

Mrs. Emma T. Welborne stated:

"I live at 710 North Hickory Street, at the corner of 5th and Hickory; Thelma Jones is my daughter; she was formerly the wife of the defendant; I knew William Roddie in his lifetime, and remember the date when he was killed; I was on my back porch when Claude Jones passed; the ground between my barn lot and where Mrs. Jones lived slanted toward the west; there was nothing to obstruct my vision, I could see the Jones' house plainly; the plot of ground on which Mrs. Jones' house was located comprises one acre and the house sets back from the street; I saw the shooting from my barn lot; I saw the defendant twice the afternoon before the shooting, first about one o'clock and then about four-thirty; he came to my house and asked about Thelma; Thelma was in the house but the defendant did not get to see her; he did not seem to be mad at that time; he came again about four-thirty and asked Thelma where she had been and she replied that it was none of his business, that she had her divorce. Bill Roddie came up in a car and stopped a little below the gate and called to Thelma and she went out and got in the car and drove down to her house and got out; before Roddie came the defendant was not mad, and after

Roddie came he remarked that he did not intend for his children to have a step-daddy; I saw the defendant the next morning about nine o'clock at my daughter's house; Allen Wise went there with the defendant; Bill Roddie, the deceased, delivered milk to my daughter about eight o'clock that morning. The defendant and Allen Wise remained at the house until Thelma and I left. The defendant and Allen Wise were drinking. Thelma and the defendant were fussing, and Thelma asked the defendant and Wise to leave and they finally left in the Wise car; I was on the back porch at my home at the time the killing took place; it was a screened in porch facing south, with a screen door in the west side; the defendant and Allen Wise passed going west on 5th Street, traveling fast; when I saw them I finished washing my hands and ran out to the barn yard; when I got out in the barn yard I saw Bill Roddie, he was coming south to the gate, he would have to go south a piece to get to the gap and then east and go on out; it seemed he had just stepped out of the house when I saw him, he was walking along slow, facing south, the best I could tell he was walking with his hands in his pockets; I next saw Claude come out of the door, and hold the screen until the baby came out, and he tiptoed, sorty bending down a little; he went out between the last two gallery posts and when out a little ways his arm came up and the gun fired and I saw the smoke and Bill went over; Bill had just got out to where he turned east and fell; there was only one shot fired; the defendant was only seven or eight feet from Bill Roddie when the shot fired; Thelma came out of the house and Allen Wise right behind her; I was still in the barn lot when they came out of the house. I ran to the telephone and phones T. O. Cullins, the justice of the peace, to send the law; to get there as soon as they could."

On cross-examination, the witness stated that when the constable, Hyden, came out she was on the parking and Hyden was going as fast as he could; she saw Mrs. Atkinson and Mrs. Ralston when she came out of the house after she had phoned the law.

Thelma Jones testified for the state that she had seen the defendant twice the day before the shooting, and almost daily for some time prior thereto; they were married and she had two children—

"The evening before the shooting the defendant wanted me to go to the house with him but I refused; I then went home with Roddie; Roddie was there the morning the defendant came and he was friendly with him and tried to get me to go back to him; that night I went out riding with Roddie and when I came back the defendant was there and I went to my mother's for the night. The defendant stayed at my house; he seemed to be mad then; the next morning Roddie brought the milk to the house and defendant offered him a drink to show him that he was not mad; Allen Wise was at my house with the defendant; I went to town and came back about one-thirty and they were gone; Roddie came about two-thirty and the defendant and Allen Wise came about four; just after Wise and the defendant came into the house Roddie left, he went out the front door; the next thing I knew I heard a shot and rushed out there, I was in the kitchen when the shot fired; I went out of the house in front and Allen Wise followed me, and when I got out in the yard I saw Roddie lying there dead in the gap; the defendant was standing there almost at Roddie's feet; the defendant made me step back; when I got out there the defendant made the remark, 'See he has tore his pants off of him trying to get his gun.' The defendant would not let me go to the body, saying I was trying to take the gun off Roddie's body. Hyden and Green came up, and the defendant gave Hyden his gun."

There is considerable other testimony as to the officer taking the gun out of his pocket, and about the pocket of his trousers being torn. Other witnesses were called to show the surroundings at the place. The defendant called several witnesses who testified in his behalf, telling of threats made by the deceased against the defendant, which threats were shown to have been communicated to

the defendant, but the greater part of the testimony tends to show that, notwithstanding these threats against the defendant by the deceased, they were together quite often, and back and forth to the house where the defendant's divorced wife resided with the children, and on more than one occasion had been drinking and engaged in poker games. The testimony all tends to show that the trouble arose because the defendant objected to the fact thatRoddie visited at the home of his diverced wife where the defendant's children were. The testimony shows that the deceased was armed with a pistol.

The defendant testified he was 38 years old; that he married Thelma Sevier, who testified against him; they had two children, the oldest about 7 and the youngest 5; he had known Bill Roddie since 1911; that he played poker and drank with Roddie; that Roddie delivered milk at his home in 1926; later he noticed and was told by others that Roddie's attention to his wife was marked; that he received information that Roddie was going to his home during his absence, and about the 1st of February, 1928, he told Roddie he would have to stay away from his home; that Roddie quit for a few days and then asked permission to deliver milk again to square an account he owed the defendant—

"My wife fussed about it; one morning Roddie and I was at John Blocker's playing poker, and in a short while I missed Roddie, and when I went home I saw Roddie holding my wife by each arm, and I said, 'Bill, I have stood this as long as I can, you will have to get away and stay away'; Roddie wanted to know what was the matter, and I said I did not want my home torn up and that he would have to get out and stay out; my wife got mad and began to pack her things up and on the 6th day of February, filed suit for divorce, and moved to her mother's. I was sent to the Muskogee jail on a charge of possession

of whisky found in the house; I remained in the house until I went to Muskogee and when I came back my wife was back there and we lived together as man and wife; my wife and I again got to discussing Roddie and I told her I would not stand for Roddie coming there, and she said that if Roddie could not come back there she would go where he could come, and she left me again. The suit for divorce went to trial about a month afterwards and a divorce was granted. After my wife left me I heard threats that Roddie made against me; I also had information that Roddie carried a pistol, and had heard Roddie testify in the Crews case, for the murder of Jim Granger, that he always carried a gun. I believed from what I had heard, and from Roddie's testimony that he carried a gun all the time. I was willing to take my wife back for the sake of the children; I wanted her to quit running around with Roddie; from the threats I had heard I thought Roddie was liable to kill me; I had been carrying a gun something like a week before the trouble; my wife never ordered me away; the day before the shooting I saw my wife in Ada, and she called me over to her car and I got in and went with her to look for the oldest boy, who was getting so bad that my wife could not do anything with him; I was at Thelma's house about 7:30 the next morning; my wife told me of the trips she and Roddie had made to Coalgate for the purpose of getting whisky; I had not taken a drink that day; about four o'clock Allen Wise went with me to Thelma's house; we parked the car just outside the garden gate, I did not know Roddie was there; I had a bad throat trouble, and when I reached the south end of the porch I began spitting and put my left hand up on the post; Wise went on in the house; while I was standing at the post Roddie came out, when he passed by I did not look up, I just glanced and saw it was him, when he passed on I kindly straightened up and he said, 'Claude, don't go in there,' and he had his hand on his right front pocket; I was about seven or eight feet from him; when I turned around I saw the handle of his gun, I jerked my pistol and fired; when I fired that shot I thought my life was in

danger or that I was in danger of receiving great bodily harm; I don't remember where Roddie had his left hand at the time I fired the shot; when Roddie made the pass for his gun I fired as quick as I could; when I fired he just kindly staggered or stumbled and went down; my wife came running out of the house and said something about me killing Roddie and commenced screaming and crying; I kept her from going to him; I stayed until the officers came."

On cross-examination, the testimony of the defendant was the same in substance as direct examination, as to what occurred at the time the shot was fired and as to what his previous relation with the deceased had been.

There is no dispute in the record as to the cause of Roddie's death; the defendant admits the shooting, and pleads justification on the ground that at the time he fired the shot the deceased was trying to draw a pistol from his pocket. The defendant and the deceased are the only two parties that were anywhere near the scene of the difficulty; Mrs. Welborne, who testified to seeing the shooting, was something like 350 or 400 feet away, and could not tell just what the deceased was doing with his hands at the time the shot was fired. This is, in substance, all of the testimony that it is necessary to incorporate in this opinion.

The defendant has assigned several errors alleged to have been committed by the court in the trial of his case. In his argument he presents only three errors assigned: First, the verdict is contrary to law; second, the verdict is contrary to the evidence; third, the court erred in overruling his motion for a new trial. These three assignments may be considered together as they have been in the brief. The contention of the defendant is that a careful consideration of the evidence will disclose that its nature is such that it is wholly insufficient under the pre-

vious holdings of this court to justify the verdict returned by the jury. Under the law, in order that the evidence may be held sufficient to sustain a conviction, it must establish all the essential facts of the crime charged in the information, and must be of such a character that this court can see that it was not influenced by passion or prejudice, and must be such as to show beyond a reasonable doubt the guilt of the defendant. The testimony in this case tends to show that the deceased was keeping company and often appearing at the home of the defendant's divorced wife; the defendant also was back and forth to the home of his former wife; and that information had been brought to the defendant that the deceased had been threatening violence against the defendant. The defendant and his divorced wife had been having some trouble about the attentions of the deceased to her.

The testimony on behalf of the state, on the morning prior to the killing and the day of the killing, tends to show that deceased was leaving the home of the defendant's divorced wife as the defendant was approaching the home, and, after the deceased had passed the defendant, or as he was going toward the gate to leave the home of the defendant's divorced wife, the defendant drew his pistol and fired the shot that took the life of the deceased. The defendant says that deceased passed him and did not speak to him, and that he glanced up and saw the deceased make an effort to draw his pistol from his pocket, and he believed he was in danger of losing his life or receiving great bodily harm at the hands of the deceased, and that he fired the shot that took the life of the deceased. This testimony, under proper instruction of the court, was submitted to the jury for its consideration, and the jury returned a verdict of manslaughter in the first degree, fixing the minimum punishment.

There is no controversy as to the law in this case, nor is there any controversy in the previous holdings of this court. This court has recently passed on this question in the case of Parker v. State, 43 Okla. Cr. 374, 279 Pac. 362, in which it was held:

"To sustain a conviction, it should appear not only that the offense was committed, but the evidence inculpating the defendant should do so to a degree of certainty, transcending mere probability or strong suspicion.

"Where the evidence in a case to sustain a verdict of guilty, is of such a weak and uncertain character that the court cannot say that the jury was not influenced by prejudice, passion, or irrelevant and incompetent testimony, a great deal of such testimony appearing in the record, this court will order a new trial."

A number of authorities are cited by the defendant, all relating to the question where a verdict of guilty is returned by the jury, without sufficient evidence to support it, the same will be set aside. In this case there is a conflict in the testimony on the question as to whether or not the defendant was justified in firing the shot that took the life of the deceased. This question was properly submitted to the jury by the court, and the jury by its verdict said that the defendant was not justified in firing the shot that took the life of the deceased, and returned a verdict of guilty of manslaughter in the first degree, fixing the minimum punishment. The weight of the evidence and the credibility of the witnesses in a criminal case is for the determination of the jury, and this court will not set aside the verdict of the jury unless it is clearly evident that the jury acted arbitrarily, or in violation of their oaths, and returned a verdict based on prejudice or passion, or without sufficient evidence to sustain the verdict.

In Ammons v. State, 25 Okla. Cr. 164, 219 Pac. 426, 427, the court said:

"Where the inference of guilt can be reasonably drawn from the evidence, this court will not pass upon the weight of the evidence in order to determine whether the defendant was guilty as charged. On the record before us it was for the jury to judge the weight of the evidence and the credibility of the witnesses, under the instructions of the court which gave the defendant the benefit of all reasonable doubt. * * *

"While it is undoubtedly true that there was, under the testimony, ample room for a different verdict, we cannot substitute our judgment for that of the jury."

In Haley v. State, 39 Okla. Cr. 186, 264 Pac. 635, this court said:

"It is not for this court [Criminal Court of Appeals] to substitute its judgment on questions of fact or of the weight of the evidence for that of the jury, where there is competent evidence from which the jury may reasonably and logically find the guilt of the defendant, even though the evidence may be conflicting, or such that different inferences may reasonably be drawn therefrom." Cain v. State, 37 Okla. Cr. 282, 257 Pac. 1114.

After a careful reading of the record in this case, we hold that, while there is a conflict in the testimony, the evidence is sufficient to sustain the verdict and judgment.

The judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.